## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | Chapter 11 |
| GEO. V. HAMILTON, INC., | Case No.   15-23704 |
| Debtor. | |

## DECLARATION OF JOSEPH E. LINEHAN IN SUPPORT
## OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Joseph E. Linehan, hereby declare under penalty of perjury:

1.      I am the General Counsel of Geo. V. Hamilton, Inc. (the "Debtor"), the

debtor and debtor-in-possession in the above-captioned chapter 11 case (this "Chapter 11 Case").

I have served in this position since January 1, 2013.  Prior to my employment by the Debtor, I

was a partner at the law firm of Meyer, Unkovic & Scott LLP, where I worked for twenty-two

years.  I am a member in good standing of the state bar in Pennsylvania, Ohio, West Virginia,

and Arizona.

2.      As General Counsel, I am one of the Debtor's employees responsible for

devising and implementing the Debtor's legal strategies, and I am familiar with the Debtor's

day-to-day operations, business, financial affairs, and books and records.  I also am familiar with

the Debtor's efforts leading up to the filing of this Chapter 11 Case.

3.      Concurrently with the filing of this declaration (this "Declaration"), on the

date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11

of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the

United States Bankruptcy Court for the Western District of Pennsylvania (the "Court")

commencing this Chapter 11 Case.  The Debtor has requested certain relief in "first day"

applications and motions filed with the Court (collectively, the "First Day Pleadings") to

US_ACTIVE-123789729

promote a seamless transition into this Chapter 11 Case and enable the Debtor to efficiently

administer its estate and its affairs.

4.      I submit this Declaration to assist the Court and other parties in interest in

understanding the circumstances that led to the commencement of this Chapter 11 Case and in

support of the Debtor's chapter 11 petition for relief and the First Day Pleadings.

5.      Except as otherwise indicated herein, all facts set forth in this Declaration

are based on my personal knowledge, information supplied to me by other members of the

Debtor's management or the Debtor's professionals, my knowledge and review of relevant

documents, or my opinion based on my experience, knowledge, and information concerning the

Debtor's operations and financial condition.  If called upon to testify, I would testify competently

to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of

the Debtor.

6.      Part I of this Declaration provides an overview of the Debtor's corporate

history, operations, and capital structure.  Part II of this Declaration summarizes the

circumstances leading to the commencement of this Chapter 11 Case.  Part III discusses the

objectives of this Chapter 11 Case, and Part IV sets forth the relevant facts in support of the First

Day Pleadings.

## I.      THE DEBTOR'S HISTORY, OPERATIONS, AND CAPITAL STRUCTURE

7.      The Debtor is a Pennsylvania corporation formed in 1947.  For the entirety

of its existence, the Debtor has been based in McKees Rocks, Pennsylvania, in leased facilities.

8.      For nearly seventy years, the Debtor has distributed insulation products

and been engaged as an insulation contractor for industrial and commercial facilities.  Over time,

the Debtor became increasingly involved as an insulation contractor in steel mills, power plants,

and similar facilities.  Over the past several years, the Debtor expanded its operations to serve the natural gas industry and quickly became a leading provider of thermal insulation for natural gas installations.  Currently, the Debtor provides its customers, located primarily in Pennsylvania, Ohio, and West Virginia, with services ranging from thermal insulation specification design, material sales, fabrication, and installation.

9.       Owing largely to the Debtor's partnership with its union work force, the Debtor maintains its hard-earned reputation for top-quality, cost-efficient performance that is unsurpassed in its market.  Throughout its history, the Debtor has retained its status as a regional leader in the distribution of thermal insulation products for industry and business.

10.       The Debtor has total assets and liabilities of approximately $21.5 million and employs approximately 200 employees (approximately 85% of whom are represented by the Asbestos Workers Local No. 2).

11.       The Debtor finances its operations and maintains cash flow through a revolving line of credit with The Huntington National Bank ("Huntington Bank").  Pursuant to the Amended and Restated Credit Agreement, effective as of December 20, 2005, among the Debtor and GVH Environmental, Inc., (a non-debtor affiliate, and together with the Debtor, the "Borrowers"), as borrowers, and Sky Bank, as lender,[1] the lender agreed to make a line of credit available to the Borrowers under which the lender may, in its sole discretion, make advances to the Borrowers in an aggregate principal amount outstanding at any time not to exceed $4.5 million (as amended, the "Pre-Petition Facility").  The Pre-Petition Facility together with any note, security agreement, mortgage, and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time, are hereinafter referred to collectively as the "Pre-Petition Loan Documents."

---

[1]  Huntington Bank is the successor in interest to Sky Bank.

12.     The level of debt drawn under the Pre-Petition Facility fluctuates from month to month, but there always is a significant balance that enables the Debtor to meet its operating costs, payroll, benefit plan contributions, and other financial obligations.  As of the Petition Date, the principal amount drawn under the Pre-Petition Facility is approximately $2.9 million (together with interest thereon and all other obligations incurred in connection therewith as provided in the Pre-Petition Loan Documents, the "Pre-Petition Obligations").

13.     The Debtor granted Huntington Bank first priority liens on and security interests in substantially all of the Debtor's assets and the proceeds thereof (the "Pre-Petition Collateral") to secure the Pre-Petition Facility.

14.     As further security for the Pre-Petition Facility, the Debtor agreed to establish a lockbox arrangement with Huntington Bank for its operating accounts.  In accordance with the Pre-Petition Loan Documents, the Debtor established two lockbox accounts with Huntington Bank through which substantially all of its operating revenues are deposited and payments are made.  Following the close of business each day, Huntington Bank sweeps each account, and any swept funds are applied to reduce the Pre-Petition Obligations.  Separately, and because the account balances are swept regularly, Huntington Bank makes immediate advances on the Pre-Petition Facility, which are transferred directly to the Debtor's accounts to fund any draws made on those accounts.

15.     The Debtor's trade debt consists of, among other things, amounts owed to utilities and suppliers of goods and services.  As of the Petition Date, the Debtor estimates that less than $250,000.00 is outstanding to its trade creditors.  The Debtor does not have any other significant debt obligations.

16.     All of the equity interests in the Debtor are held by five individuals, four

of which also serve as directors and officers of the Debtor.

## II.    EVENTS LEADING TO COMMENCEMENT OF THIS CHAPTER 11 CASE

17.     During its history, the Debtor distributed or installed an asbestos-

containing insulation product.  As a result, for the past thirty years, the Debtor has been a

defendant in litigation in multiple jurisdictions in which claimants (the "Claimants") seek money

damages for personal injury and wrongful death as a result of alleged exposure to asbestos-

containing products distributed or sold by the Debtor (the "Asbestos Claims").  These suits have

been filed primarily in state courts in western Pennsylvania, West Virginia, and eastern Ohio,

with a relatively small number of filings in other venues.

18.     As of the Petition Date, the Debtor estimates that there are approximately

2,000 Asbestos Claims outstanding against the Debtor.  Only approximately $8 million of

insurance settlement proceeds remain available to the Debtor to resolve Asbestos Claims.

19.     The volume of Asbestos Claims filed against the Debtor since 2005

coupled with the rapidly decreasing pool of available insurance settlement proceeds has

produced an overwhelming threat to the Debtor's continued viability, despite its longstanding

record of operational success.  Accordingly, after years of defending the Asbestos Claims in the

tort system, the Debtor determined that it is in the best interests of the Debtor and its creditors for

the Debtor to commence this Chapter 11 Case to facilitate an orderly process for a fair and

efficient resolution and payment of the Asbestos Claims.

## III.    PURPOSE OF THIS CHAPTER 11 CASE

20.     As noted, the Debtor has been successful operationally.  The Debtor filed

this Chapter 11 Case for the purpose of resolving all existing and future Asbestos Claims

pursuant to section 524(g) of the Bankruptcy Code.  To resolve the Asbestos Claims, the Debtor

intends to seek confirmation of a chapter 11 plan of reorganization that will provide for the

establishment of an asbestos personal injury trust into which certain assets of the Debtor,

including but not limited to insurance rights and settlement proceeds, will be transferred.  The

trust will assume liability for all Asbestos Claims and use its assets to resolve the Asbestos

Claims and, if eligible, compensate the holders of the Asbestos Claims.  By establishing

procedures to govern trust distributions, the trust will be able to value and pay Asbestos Claims

in a fair and efficient manner.

       21.    In conjunction with the establishment of the asbestos personal injury trust,

the Debtor will seek the issuance of a channeling injunction, which will enjoin any entity that

holds or asserts, or that may in the future hold or assert, an Asbestos Claim from taking any

action for the purpose of directly or indirectly recovering on such Asbestos Claim from the

Debtor and certain other protected parties.  Accordingly, if the Debtor's plan is confirmed, the

sole recourse of any current or future holder of an Asbestos Claim on account of such Asbestos

Claim will be against the asbestos personal injury trust.

## IV.    SUMMARY OF FIRST DAY MOTIONS

       22.    Concurrently with its chapter 11 petition, the Debtor filed the following

First Day Pleadings:

    a.    Debtor's Emergency Motion for Entry of Interim and Final Orders:
(I) Authorizing Debtor to (A) Obtain Postpetition Financing and
(B) Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362, 363,
and 364; and (II) Scheduling Final Hearing Pursuant to Fed.R.Bankr.P.
4001 and Local Rules 4001-2 and 9013-2 (the "DIP Financing Motion");

    b.    Debtor's Emergency Motion Pursuant to 11 U.S.C. §§ 105 and 363 for an
Order Authorizing Maintenance of Existing Bank Accounts and Continued
Use of Existing Checks and Business Forms (the "Bank Account
Motion");

  
c.    Debtor's Emergency Motion for an Order Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 1107(a), and 1108 (A) Authorizing Payment of Prepetition Employee Obligations Including Wages, Salaries, and Employee Benefits, (B) Authorizing Continuation of Employee Benefit Plans and Programs Post-Petition, and (C) Directing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations (the "Wages and Benefits Motion");

d.    Debtor's Emergency Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364, 507(a), and 541 for Order Authorizing Payment of Prepetition Taxes (the "Taxes Motion");

e.    Debtor's Emergency Motion for an Order Under 11 U.S.C. §§ 105(a), 363(b), 364, 1107(a) and 1108 Authorizing Payment of Prepetition Claims of Certain Critical Vendors and Service Providers (the "Critical Vendor Motion");

f.    Debtor's Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for Interim and Final Orders (I) Prohibiting Utility Service Providers From Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Finding the Utility Service Providers Adequately Assured of Payment, (III) Establishing Further Procedures For Future Payment, and (IV) Authorizing the Debtor to Add Utility Service Providers as Necessary (the "Utilities Motion");

g.    Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Listing of Addresses of Counsel for Personal Injury Claimants in Creditor Matrix in Lieu of Claimant's Addresses and (II) Approving Notice Procedures for Such Claimants (the "Law Firms in Lieu of Claimants Motion"); and

h.    Debtor's Motion for Entry of an Order Extending Deadline to File Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Extension Motion").

23.    I am familiar with the contents of each First Day Pleading, and the facts set forth therein, insofar as I have been able to ascertain after reasonable inquiry, are true and correct to the best of my knowledge.  The relief sought in the First Day Pleadings:  (i) is necessary to enable the Debtor to operate in chapter 11 with minimum disruptions; (ii) is important to the Debtor's achievement of a successful restructuring; and (iii) will enable the Debtor to efficiently administer its estate and affairs in the best interests of creditors.  I believe

that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the

goals identified above.

**A.      DIP Financing Motion**

24.      Due to changes in trial schedules and developments in regard to asbestos

personal injury claims pending in multiple jurisdictions against the Debtor, the Debtor had

limited time to prepare for this filing, including obtaining debtor-in-possession ("DIP")

financing.

25.      Prior to the Petition Date, the Debtor approached its pre-petition lender,

Huntington Bank, seeking DIP financing on terms similar to the Pre-Petition Facility.

Huntington Bank expressed interest, and, thereafter, the parties and their respective counsel

engaged in negotiations related to a DIP credit facility.

26.      Although the parties have not fully documented the terms of a DIP

facility, Huntington Bank agreed to provide post-petition credit to the Debtor on terms similar to

the Pre-Petition Facility as more fully set forth in the term sheet (the "DIP Term Sheet") attached

to the DIP Financing Motion as Exhibit A.  Indeed, with the exception of minor concessions

from the Debtor to provide additional credit protections to Huntington Bank, the DIP Term Sheet

provides for the continuation of the same lending/banking relationship between Huntington Bank

and the Debtor that existed prior to the Petition Date.

27.      The Debtor has an immediate need to obtain post-petition credit and the

use of the Pre-Petition Collateral, including cash collateral, to, among other things, continue the

orderly operation of its business, make payroll, and preserve the value of the estate while the

Debtor formulates and seeks confirmation of a plan of reorganization.  Absent approval of the

DIP Term Sheet, the Debtor and its estate will be harmed immediately and irreparably because

the Debtor will not have sufficient liquidity to operate its business or prosecute this Chapter 11

Case.  The Debtor has reviewed its books and records and determined that $1.5 million is the

minimum amount of credit that it will need during the next forty-five days to ensure that it has

sufficient liquidity to operate.

28.      The Debtor does not believe that it would be able to obtain financing on

better terms than those offered by Huntington Bank.  The Pre-Petition Facility was the best

available option for the Debtor prior to commencing this Chapter 11 Case.  The Pre-Petition

Facility and Pre-Petition Loan Documents were negotiated at arm's length by the Debtor and the

Pre-Petition Lender.  The Debtor, in its business judgment, believes that the terms of the Pre-

Petition Facility and Pre-Petition Loan Documents constitute market terms and were the best

available terms upon which the Debtor could obtain financing prior to the Petition Date.

Because the Debtor could not obtain better terms prior to the Petition Date, and in light of the

Debtor's current situation, the Debtor does not believe it will fare any better on a post-petition

basis.  The Debtor believes that obtaining sufficient financing on an unsecured or junior priority

basis is unobtainable.

## B.    Bank Account Motion

29.      To avoid delays in paying debts incurred post-petition, and to facilitate a

smooth transition into chapter 11, the Debtor should be permitted to maintain the existing Bank

Accounts (as defined in the Bank Account Motion) and, if necessary, open new accounts and

close existing accounts in the ordinary course of business.  Otherwise, transferring bank accounts

will be disruptive, time consuming, and expensive.  The Debtor believes that its transition to

chapter 11 will be smoother and more orderly, with minimal disruptions and harm to the estate, if

the Bank Accounts are continued following the Petition Date with the same account numbers.

30.     The Debtor will work closely with each of its banks (Huntington Bank and First Niagara Bank, the "Banks") to ensure that appropriate procedures are in place so that checks issued before the Petition Date, but presented after the Petition Date, are not honored absent Court approval.  To this end, the Debtor requests that the Banks be authorized and directed to accept and honor all representations from the Debtor as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Petition Date.  The Debtor also requests that no Bank that honors a pre-petition check or other item drawn on any account that is the subject of this Motion (i) at the direction of the Debtor, (b) with a good faith belief that the Court authorized such pre-petition check or item to be honored, or (c) as a result of an innocent mistake despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtor or its estate on account of such pre-petition check or other item being honored post-petition.  The Debtor believes that having such flexibility accorded to the Banks is necessary to induce the Banks to continue providing services to the Debtor.

31.     Because of the complexity of the Debtor's banking arrangements, it is imperative that the Debtor be permitted to use the Bank Accounts to avoid disruption of the normal operation of its business.  By preserving business continuity and avoiding the disruption and delay to the Debtor's collection and disbursement procedures that necessarily would result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees and vendors, will be best served.

32.     The Debtor issues a large number of checks, and uses a large volume of purchase orders, letterhead, envelopes, and other business forms (collectively, the "Business Forms") in the ordinary course of business.  The Debtor requests that it be authorized to continue

using its existing checks in their present form, provided the Debtor (i) create a clear break (50

checks) in check numbers post-petition and (ii) stamp or write "*Debtor in Possession, In re Geo.*

*V. Hamilton, Inc., Case No. 15-[●] (Bankr. W.D. Pa.)*" on all post-petition checks issued after

the existing check stock is exhausted.  The Debtor requests that it be authorized to continue using

its existing Business Forms, including electronically generated forms, substantially in the form

existing immediately before the Petition Date, provided that (i) notice of this Chapter 11 Case is

sent to each party receiving a business form or (ii) the business forms are stamped to indicate

that the Debtor is a debtor-in-possession.  After exhausting such existing Business Forms, the

Debtor will reorder its Business Forms with the required "Debtor in Possession" designation as

well as the case number for this Chapter 11 Case.

### C.      Wages and Benefits Motion

#### *The Debtor's Workforce*

33.      The Debtor currently employs approximately 200 employees (the

"Employees").  Of this amount, approximately (i) 170 are hourly union Employees (the "Union

Employees"), (ii) 13 are non-union hourly employees (the "Non-Union Hourly Employees"), and

(iii) 23 are salaried employees (the "Salaried Employees" and, together with the Non-Union

Hourly Employees, the "Non-Union Employees").

34.      The Debtor's Union Employees are represented by Asbestos Workers

Local No. 2, Asbestos Workers Local No. 80, and Asbestos Workers Local No. 84 (the

"Asbestos Unions").

35.      The continued and uninterrupted support of the Employees is essential to

the Debtor's success.  The Employees perform a variety of critical functions for the Debtor's

business, including, without limitation:  installing thermal insulation; procurement and supply;

sales and marketing; accounting; administration; budgeting and planning; finance; safety; human resources and communication; legal; and compliance.  The Employees' skills and specialized knowledge and understanding of the Debtors' assets and operations, as well as their relationships with customers, vendors, and other third parties, are essential to the administration of this Chapter 11 Case, the preservation of the value of the Debtor's estate, and the ability of the Debtor to effectively reorganize.

36.     Any interruption in payment of prepetition Employee-related obligations will impose additional hardship on Employees and likely jeopardize their continued performance as the Debtor attempts to transition into this Chapter 11 Case.  Additionally, the failure to maintain Employee wages and benefits would erode morale.  As of the Petition Date, many Employees were owed or had accrued various sums for wages, salaries, overtime pay, incentive pay, sick pay, vacation pay, holiday pay, and other accrued compensation and related costs, certain business expenses, payroll deductions, and various employee benefits.

*Wages and Salaries*

37.     The Debtor pays its Union Employees each Monday for wages earned during the pay period commencing on Monday and ending on Sunday through a payroll system that is administered and maintained internally.  The average gross payroll per weekly pay period for the Debtor's Union Employees, including vacation, holiday, personal, and sick time, is approximately $150,000.00.

38.     The Debtor pays its Non-Union Employees each Friday for wages and salaries earned during the pay period commencing on Monday and ending on Friday through a payroll system that is administered and maintained internally.  The average gross payroll per

- 12 -

weekly pay period for the Debtor's Non-Union Employees, including vacation, holiday, personal, and sick time, is approximately $65,000.00.

39.     Though the Debtor has remained current on its payroll, as of the Petition Date, which fell during a pay period, the Debtor is obligated to the Employees for pre-petition compensation in the form of accrued but unpaid wages and salaries in the aggregate amount of no more than $215,000.00.  The Debtor seeks authority to pay such accrued compensation as it becomes due and owing in the ordinary course of the Debtor's business operations.

### *Deductions, Withholdings, and Payroll Taxes*

40.     For each applicable payroll period, the Debtor routinely deducts certain amounts from Employee paychecks, including, without limitation, pre- and after-tax deductions (the "Deductions") payable pursuant to certain of the employee benefit plans discussed herein. The Debtor remits the Deductions to the appropriate third-party recipients.

41.     In addition to the Deductions, federal and state laws require the Debtor to withhold amounts related to federal, state, and local income taxes and Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withholdings").  The Debtor must then match the withheld amounts from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholdings, the "Payroll Taxes").

42.     In the aggregate, the Deductions and Payroll Taxes total approximately $40,000.00 per payroll period for Union Employees and $20,000.00 per payroll period for Non-Union Employees.  The Debtor requests authority to remit any pre-petition amounts to the appropriate third-party recipients and taxing authorities.

*Annual Incentive Bonus*

43.     To encourage Non-Union Employees to maximize their efforts and performance, the Debtor historically has maintained a discretionary incentive bonus program that compensates non-insider Non-Union Employees based upon production and profitability (the "Bonus Program").  If the requisite metrics are achieved, the bonus historically has been paid on or about December 20th of each year.  The amount of the bonus can be as much as 40% of a Non-Union Employee's base compensation for the year.  The Non-Union Employees have come to expect the annual incentive bonus as part of their total compensation package.  By this Motion, the Debtor seeks authority to continue the Bonus Program solely for the Debtor's eligible non-insider Non-Union Employees and to pay prepetition amounts due thereunder to such non-insiders.

*Reimbursable Business Expenses*

44.     In the ordinary course of its business, the Debtor reimburses Employees for certain reasonable and customary expenses incurred in the scope of their service on behalf of the Debtor (collectively, the "Reimbursable Expenses"), including, without limitation, expenses related to business travel.  The Reimbursable Expenses are ordinary course expenses that Employees incur in performing their job functions and vital to the continued operation of the Debtor's business and the preservation of the value of the Debtor's estate.  The Debtor requests authority to continue reimbursing, or making direct payments on behalf of, Employees for such Reimbursable Expenses in the ordinary course of its business.

45.     The Debtor maintains several corporate charge card arrangements to facilitate the processing of business-related expenses in the ordinary course.  Certain Non-Union Employees utilize company credit cards (collectively, the "Corporate Cards") for business travel and entertainment expenses.  The Debtor believes that the Corporate Cards are beneficial to the

Debtor because they minimize the need for Employees to incur personal expenses for purchases made on behalf of the Debtor and facilitate the processing of expenses by the Debtor.  In a typical month, the Debtor incurs approximately $16,500.00 in charges for the Corporate Cards.

46.     In addition to the Corporate Cards, certain Non-Union Employees utilize fuel purchasing cards (collectively, the "Fuel Cards") for fuel for vehicles used for business purposes.  The Debtor is invoiced for amounts due under the applicable card program on a monthly basis.  The Debtor incurs approximately $5,000.00 in monthly obligations on account of the Fuel Cards.

47.     In the aggregate, the Employees incur approximately $25,000.00 per month in Reimbursable Expenses.  The Debtor seeks authority to continue to pay any Reimbursable Expenses that the Employees have incurred prior to the Petition Date or will incur during this Chapter 11 Case.

*Employee Benefits*

48.     The Debtor maintains and/or contributes to a number of Employee benefit programs (collectively, the "Benefit Programs"), including but not limited to various programs that offer health, disability, and life insurance coverage, defined benefit plans for certain Employees, and other similar employee benefits (collectively, the "Benefits").

49.     Certain Benefits require payments by the Debtor and may be unpaid as of the Petition Date because certain obligations under the Benefit Programs accrued either in whole or in part prior to the Petition Date, but were not payable in the ordinary course of the Debtor's business until after the Petition Date.  The Debtor seeks authority to pay all prepetition Benefits that had accrued but remained unpaid as of the Petition Date.

*Medical and Insurance Benefits*

50.     In the ordinary course of its business, the Debtor provides medical, dental, vision, and prescription drug insurance, long- and short-term disability insurance, life insurance, and other related benefits (the "Medical and Insurance Benefits") to Employees and other beneficiaries.  The Debtor provides Medical and Insurance Benefits through company-sponsored plans and various union plans pursuant to the terms of governing collective bargaining agreements.

51.     Non-Union Employees.  The Debtor provides healthcare coverage to Non-Union Employees under a preferred provider organization insurance plan.  The Debtor pays monthly premiums of approximately $52,000.00 to its insurance carrier in advance on the 20th day of every month.  The Debtor seeks authority to continue paying monthly premiums to its insurance carrier for the Non-Union Employees' Medical and Insurance Benefits in the ordinary course of business.

52.     Union Employees.  Medical and Insurance Benefits for the Union Employees is provided under the terms of various multiemployer plans governed pursuant to the terms of the applicable collective bargaining agreements.  The Debtor makes monthly contributions for the Union Employees' Medical and Insurance Benefits in the approximate amount of $110,000.00 on the 15th day of every month in arrears.  The Debtor seeks authority to continue making contributions for the Union Employees' Medical and Insurance Benefits in the ordinary course of business.

53.     Disability and Life Insurance.  The Debtor provides short- and long-term disability coverage and life insurance benefits for its Non-Union Employees ("Disability and Life Insurance").  The monthly payment on account of Disability and Life Insurance is approximately $1,500.00.  The Debtor seeks authority to pay amounts due on account of

Disability and Life Insurance as of the Petition Date and to continue these Benefit Programs in the ordinary course of business.

*Retirement Benefits*

54.     The Debtor provides retirement benefits (the "<u>Retirement Benefits</u>") to its Employees under plans sponsored by the Debtor, for Non-Union Employees, or administered by the Asbestos Unions, for Union Employees.

55.     <u>Company-Sponsored Defined Contribution Plan</u>.  The Debtor maintains a qualified defined contribution profit sharing plan (the "<u>Profit Sharing Plan</u>") for the benefit of eligible Non-Union Employees.  The Debtor makes a payment equal to 15% of each eligible Non-Union Employee's compensation to the profit-sharing plan once at the end of each calendar year.  The Debtor seeks authority to continue the Profit Sharing Plan in the ordinary course of business.

56.     <u>Retirement Plans for Union Employees</u>.  The Debtor is required by collective bargaining agreements with the Asbestos Unions to participate in, and make contributions to, multiemployer pension plans for the Union Employees (the "<u>Union Retirement Plans</u>").  The Debtor makes monthly contributions in the approximate amount of $190,000.00 to the Union Retirement Plans on the 15th of every month in arrears.  The Debtor seeks authority to make contributions due to the Union Retirement Plans as of the Petition Date and to continue participating in, and making contributions to, the Union Retirement Plans in the ordinary course of business.

*Paid Time Off*

57.     The Debtor provides Employees with paid time off benefits, including vacation, holidays, personal days, and sick days ("<u>Paid Time Off</u>").  The Debtor seeks to allow Employees who have accrued Paid Time Off as of the Petition Date to utilize those vacation days

or personal days postpetition without disruption and to continue honoring company-paid holidays for eligible Employees.

**D.     Taxes Motion**

58.     In the ordinary course of its business, the Debtor is required to pay various taxes and fees to federal, state, and local taxing authorities (the "Taxing Authorities"), including but not limited to sales, use, gross receipts, and federal excise taxes (the "Sales and Use Taxes") and certain other taxes and fees, including income, personal property, corporate franchise, real property, business license, and *ad valorem* taxes (the "Other Taxes" and, together with the Sales and Use Taxes, the "Taxes" and, together with any other type of taxes, fees, charges, penalties, or interest, the "Taxes and Fees").[2] Prior to the Petition Date, the Debtor generally paid its tax obligations as they became due.

59.     The Debtor, in the ordinary course of its business, is required to collect various Sales and Use Taxes in connection with the sale of goods and the purchase of materials and supplies from vendors.  The Debtor must remit the Sales and Use Taxes to the various governmental entities of the jurisdictions in which the Debtor conducts business.  As of the Petition Date, the Debtor estimates that the aggregate amount of Sales and Use Taxes owing to the Taxing Authorities is less than $10,000.00.

60.     The Debtor, in the ordinary course of its business, incurs various Other Taxes, including, but not limited to, income, personal property, corporate franchise, real property, business license, and *ad valorem* taxes.  The process by which the Debtor remits such Other Taxes varies, depending on the nature of the tax at issue and the Taxing Authority to which the relevant tax is paid.  As of the Petition Date, the Debtor estimates that the aggregate amount of Other Taxes owing to the Taxing Authorities is less than $10,000.00.

---

[2]  The Debtor reserves all of its rights to contest the validity or amount of any taxes that may be alleged to be due.

E.       **Critical Vendor Motion**

61.      As of the Petition Date, the Debtor has approximately 200 open projects for customers.  These insulation design, fabrication, and installation projects are for a variety of applications, whether for heat loss/gain, condensation control, or personnel protection, and may be for temperature ranges from -450 degrees to 2600 degrees Fahrenheit.  Each project is customized and has unique technical specifications.  As a result, the insulation materials and other supplies utilized by the Debtor to create the insulation product and encapsulating fabric are highly engineered and may only be purchased from certain vendors, most of which are sole source suppliers.  Because each project is highly specialized, the Debtor cannot simply stock generic insulation materials and other supplies and install off-the-rack insulation on any job.  Instead, the Debtor must analyze the technical specifications for each project, obtain highly-engineered materials from its suppliers, and fabricate and install the appropriate product.

62.      For these reasons, the Debtor estimates that there are approximately 15 suppliers of insulation materials and other industrial supplies utilized in the fabrication of the Debtor's insulation products that are critical to the Debtor's business operations and continued financial viability.  If these critical vendors stopped making materials available to the Debtor, the Debtor could not complete the approximately 200 projects that currently are queued for completion nor any future projects.

63.      The Debtor anticipates that Critical Vendors may:  (a) refuse to deliver goods and services without payment of their prepetition claims; or (b) refuse to deliver goods and services on reasonable price or credit terms absent payment of prepetition claims.  Accordingly, payment of the Critical Vendor Claims is vital to the Debtor's ability to deliver and install its products and, thus, to preserve and maximize value for all stakeholders.

64.     To ensure that the Debtor identifies as Critical Vendors only those vendors and service providers that actually are critical to the Debtor's business, and who will refuse to, or who will demand pricing or trade terms that constitute an effective refusal to, provide goods or services if not paid, certain of the Debtor's employees and professionals who are responsible for maintaining the Debtor's vendor and service provider relationships, have conducted, and will continue to conduct, an analysis and review of the Debtor's immediate needs for goods and services.

65.     The Debtor will use the following criteria to determine which of the Debtor's vendors and service providers are Critical Vendors:  (a) whether the vendor or service provider is a sole-source provider; (b) whether the Debtor receives advantageous pricing or other terms from a vendor or service provider such that a postpetition replacement would result in significantly higher costs; (c) whether quality or quantity requirements, geographic constraints, customizations, or other specifications prevent the Debtor from obtaining the necessary goods or services from alternative sources within a reasonable timeframe; (d) whether, if the vendor is not a sole-source provider, the Debtor has insufficient inventory of goods or in-house capabilities to continue operations while a replacement is found and put into place; (e) whether a vendor or service provider has possession of goods, products, or other deliverables as to which they are able to claim a possessory lien and, thus, to decline to deliver such items to the Debtor without payment; (f) whether a vendor's prepetition claim is entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code; **<u>or</u>** (g) whether the vendor or service provider provides goods or raw materials used in, or otherwise critical to, the manufacture of products that subject the vendor or service provider to customer approval; **<u>and</u>** (h) whether a vendor or service provider meeting any of the aforementioned standards in (a) through (g) refuses, or demands

- 20 -

pricing or trade terms that constitute an effective refusal, to provide goods or services to the

Debtor on a postpetition basis if some or all of the prepetition balances are not paid.  The Debtor

is confident that this process will appropriately identify only those vendors and service providers

that are critical to the estate.

### F.    Utilities Motion

66.    In the ordinary course of business, the Debtor regularly incurs expenses

for electricity, natural gas, water, sewer, waste removal, telecommunications, and other similar

services (excluding amounts claimed or owing other than for actual services, the "Utility

Services") supplied by various service providers (the "Utility Providers"), including those Utility

Providers identified on the schedule attached to the Utilities Motion as Exhibit A (the "Utility

Service List" ).  The average aggregate monthly obligation to the Utility Providers on account of

the Utility Services over the twelve (12) months immediately preceding the Petition Date is

approximately $9,220.00.

67.    The Debtor typically pays the invoices issued by the Utility Providers on a

monthly basis.  Historically, the Debtor has been timely in the payment of its bills for Utility

Services.  Due to the timing of the Debtor's bankruptcy filing, it is possible that:  (i) certain

prepetition Utility Services remain unpaid because they were not billed prior to the Petition Date;

or (ii) payment of certain prepetition invoices did not clear prior to the Petition Date.

68.    The Debtor fully intends to pay all post-petition obligations owed to the

Utility Providers for Utility Services in a timely manner and expects that it will have sufficient

funds with which to satisfy fully all of its post-petition Utility Service obligations.  Further, the

Debtor represents that its debtor-in-possession financing will enable the Debtor to pay promptly

all of its obligations to the Utility Providers for post-petition Utility Services on an ongoing basis
in the ordinary course of business.

69.      Nevertheless, to provide additional assurance of payment for future
services to the Utility Providers, the Debtor will deposit $9,220.00 (the "Adequate Assurance
Deposit"), equal to the average monthly cost of Utility Services over the twelve (12) months
immediately preceding the Petition Date, into a newly created, segregated, interest-bearing
account, within the later of twenty (20) days of the Petition Date and ten (10) days of the entry of
the interim Utility Order.

70.      The Utility Providers administer essential services that are crucial to the
continued operations of the Debtor.  The temporary or permanent discontinuation of Utility
Services could irreparably disrupt the Debtor's business operations and, as a result,
fundamentally undermine the Debtor's reorganization efforts.  Accordingly, the relief requested
in the Utilities Motion is necessary to enable the Debtor to continue its business operations
uninterrupted by threats of potential termination or suspension of, or interruption in, its Utility
Services.

### G.      Law Firms in Lieu of Asbestos Claimants Motion

71.      The Debtor's defense counsel tracks Asbestos Claims against the Debtor
by maintaining a database that identifies the names, but not the addresses, of the Claimants.
Defense counsel's database, however, includes the addresses for the Claimants' respective
counsel of record, and all communications regarding the Asbestos Claims and the various
pending lawsuits are conducted through counsel.

72.      Throughout the course of this Chapter 11 Case, various notices, mailings,
and other communications must be sent to the Claimants.  To ensure that the Claimants receive

proper and timely notice of filings and critical events in this Chapter 11 Case, the Debtor seeks to

establish the following procedures (the "Notice Procedures") to give notice to Claimants in this

Chapter 11 Case.  With the assistance of an agent approved by the Court, the Debtor proposes to

serve all notices, mailings, and other communications that are required to be served on the

Claimants to the Claimants' respective counsel of record in the manner required pursuant to

applicable noticing procedures in effect in this Chapter 11 Case.

       73.     By establishing the Notice Procedures in this Chapter 11 Case, the

Claimants will receive superior notice than they would if the Debtor attempts to deliver notices

directly to the Claimants.  The Claimants are lay persons, most of whom have not been involved

in a commercial bankruptcy case or seen the types of notices and pleadings that will be served in

this Chapter 11 Case and likely will be unfamiliar with the actions that may be required to

respond to such notices.  Additionally, the Notice Procedures will ease the Debtor's

administrative burden of sending notices to thousands of Claimants, resulting in more cost-

effective notice procedures that benefit the Debtor's estate and creditors.

**H.    Extension Motion**

       74.     Cause exists to extend the date on or before which the Debtor must file its

schedules and statement of financial affairs by thirty (30) days.  The Debtor is working diligently

towards completing its Schedules and Statement.  Nonetheless, the Debtor requires an extension

of an additional thirty (30) days to file these documents.  The extension is necessary due to the

number of the Debtor's creditors, the size of the Debtor's business, and the limited staffing

available to gather, process, and complete the Schedules and Statement.  Additionally, in the

days leading to the Petition Date, the Debtor was performing many critical tasks to position its

estate to maximize value for creditors.  The Debtor further estimates that, with the critical

matters to be addressed in the early days of this case, it will require more than fourteen (14) days after the Petition Date to complete the Schedules and Statement.  Because focusing the attention of the Debtor's officers and directors on chapter 11 compliance issues during the early days of this Chapter 11 Case will facilitate the Debtor's smooth transition into chapter 11 and an efficient resolution of asbestos claims, the Debtor believes that its request for a thirty (30) day extension of time to file its Schedules and Statement will maximize the value of its estate for the benefit of all parties in interest.

75.     The additional time requested also should help ensure that the Schedules and Statement are as accurate as possible.  Given the volume of information provided in these documents and the fact that the information is required to be accurate as of the Petition Date, providing the Debtor additional time will help ensure that the relevant information is fully processed through the Debtor's information systems and can be incorporated into the relevant schedule.  Rushing to complete the Schedules and Statement soon after the Petition Date may compromise the completeness and accuracy of the information provided.

76.     Moreover, an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtor will file the Schedules and the Statement far in advance of any deadline for filing proofs of claim in this Chapter 11 Case.

*[The remainder of this page was intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and belief.

Dated:  October 8 , 2015

Joseph E. Linehan, General Counsel
Geo. V. Hamilton, Inc.